# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: **JANUARY 17, 2018**

**No. A-1-CA-34971**

**JOSÉ MELENDEZ,**

      Worker-Appellant,

v.

**SALLS BROTHERS CONSTRUCTION, INC.,
and BITUMINOUS INSURANCE COMPANY,**

      Employer/Insurer-Appellee.

**Correction/Replacement Page(s) to filed Opinion**

Date Filed: **January 17, 2018**

   (1)    Page 8, line 2: replaced "they are" with "it is"
   (2)    Page 9, line 6: deleted "the" before "Worker's"
   (3)    Page 11, line 8: replaced "," after "Section 1" with "—"
   (4)    Page 11, line 8: replaced "—" after "18" with ","
   (5)    Page 13, line 3: replaced "attach" with "attached"
   (6)    Page 13, line 7: added "—" after "attestation"
   (7)    Page 13, line 8: added "—" after "verifcation
   (8)    Page 13, line 18: changed "*Ketchican*" to "*Ketchikan*".
   (9)    Page 14, line 7: changed "worker's" to "workers' "
  (10)    Page 15, line 1: changed "reject to adopt such an approach" to "reject such an approach"

**\*\* The above corrections have changed the pagination of pages 14 & 15 of the Opinion.**

# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: **JANUARY 17, 2018**

**No. A-1-CA-34971**

**JOSÉ MELENDEZ,**

     Worker-Appellant,

v.

**SALLS BROTHERS CONSTRUCTION, INC.,**
**and BITUMINOUS INSURANCE COMPANY,**

     Employer/Insurer-Appellee.

**APPEAL FROM THE WORKERS' COMPENSATION ADMINISTRATION**
**Terry Kramer, Worker's Compensation Judge**

Donald D. Vigil, P.C.
Donald D. Vigil
Nicholas C. Silver
Albuquerque, NM

for Appellant

Camp Law, LLC
Minerva Camp
Albuquerque, NM

for Appellee

**OPINION**

**ZAMORA, Judge.**

{1}     José Melendez (Worker) filed for workers' compensation benefits following a work-related accident while employed with Salls Brothers Construction, Inc. (Employer). The workers' compensation judge (WCJ) denied Worker modifier benefits because he presented false documentation while filling out his I-9 form. We affirm.

**BACKGROUND**

{2}     Worker is an undocumented immigrant from Mexico, first coming to the United States in 1979 and working in various agricultural and construction jobs. At all times material to this matter, Worker was an employee of Employer, having been hired in July 2006. Worker performed construction labor for Employer without the necessary legal authorization. On December 12, 2007, Worker was injured while at work. He was standing on scaffolding, which subsequently collapsed causing him to fall approximately five to six feet to the ground. As a result of his fall he suffered lumbar spondolysis and myofascial pain.

{3}     Worker applied for workers' compensation benefits and after a trial on the merits, the WCJ concluded that Worker was entitled to temporary total disability benefits from the date of the accident, December 12, 2007, through the date of his

maximum medical improvement, October 23, 2009. Additionally, the WCJ concluded that Worker was further entitled to permanent partial disability benefits for the 500 week benefit period, commencing October 23, 2009. Finally, the WCJ concluded that Worker was not entitled to modifier benefits based on his undocumented status.

{4} Upon being denied modifier benefits, Worker appealed to this Court and in accordance with the mandate from our New Mexico Supreme Court, we remanded with instructions for the WCJ to review the case in light of the Court's ruling in *Gonzalez v. Performance Painting, Inc.*, 2013-NMSC-021, 303 P.3d 802. The WCJ was tasked with determining whether Worker was entitled to modifier benefits. This determination turned on whether Employer knew or should have known that Worker was undocumented at the time of his hire.

{5} After a second trial on the merits to examine this narrow question, the WCJ found that Employer followed appropriate hiring procedures in hiring Worker. Worker's personnel file contained two Employment Eligibility Verification forms (I-9 forms), the first dated July 2006 and the second dated May/June 2007. The WCJ further found that Worker knowingly produced false documentation to support his employment application, including a false Social Security card, a false resident alien card, and a false Colorado identification card. Because Employer reasonably relied on Worker's false documentation, the WCJ concluded that "there was no reasonable

2

basis for Employer to have [knowledge that] Worker was undocumented." Consequently, the WCJ concluded that Worker was not entitled to modifier benefits. This appeal followed.

{6}     On appeal, Worker contends that the WCJ erred in his interpretation of *Gonzalez* as it applied to Worker. Additionally, Worker argues that Employer is liable for paying modifier benefits to Worker because "fatal substantive flaws" exist in Worker's I-9 forms, and such flaws prohibit Employer from successfully advancing a good faith defense under federal immigration law. Worker admits to providing Employer with false documentation to obtain employment, calling the decision "unfortunate." In response, Employer argues it complied in good faith with the Immigration Reform and Control Act of 1986 (IRCA), 8 U.S.C. § 1324a(a)(3) (2012), and Employer reasonably relied on the false documentation that Worker deceptively provided to Employer during the hiring process.

**DISCUSSION**

**A.     Workers' Compensation Act and IRCA**

{7}     The Legislature designed the Workers' Compensation Administration Act (the WCAA) as a balance between the rights and interests of the worker and the employer. *See* NMSA 1978, §§ 52-5-1 to -22 (1987, amended through 2013) (stating that the Act is not to be construed in a manner that favors the employee over the employer,

nor is it to be construed in a manner that favors the employer over the employee); *Salazar v. Torres*, 2007-NMSC-019, ¶ 10, 141 N.M. 559, 158 P.3d 449 ("One policy factor of great concern is that any judicial analysis under the Act must balance equally the interests of the worker and the employer without showing bias or favoritism toward either.").

{8} The Act generally applies to undocumented workers. *Gonzalez*, 2013-NMSC-021, ¶ 10. This opinion focuses on the circumstances under which undocumented workers qualify for modifier benefits under the Act. Modifier benefits are applicable when a worker has suffered a permanent injury but the benefits are not permanent. NMSA 1978, § 52-1-26(B), (D) (1990, amended 2017).

{9} IRCA places an affirmative duty on employers to verify that their employees are authorized to work in the United States. § 1324a(a)(1)(B)(i). It is on the I-9 form where an employer attests, under penalty of perjury, that they or their representative have examined certain documentation provided by the new employee, and as a result verifies that the new employee is authorized to work in the United States. § 1324a(b)(1). The employee must also attest, under penalty of perjury, to a specific category of eligibility into which he or she fits. § 1324a(b)(2). Where an employer has properly filled out the I-9 form based on false documents provided by an undocumented worker, and where the employer has complied in good faith with

IRCA's requirements, the employer is entitled to an affirmative defense to any violation. § 1324a(a)(3).

**B.    *Gonzalez***

{10}    In *Gonzalez*, our Supreme Court held that undocumented workers are not categorically ineligible for modifier benefits based solely on the fact that they are lawfully ineligible to work under federal law. 2013-NMSC-021, ¶¶ 19-26. Categorically denying all undocumented workers modifier benefits based on their immigration status alone would serve to turn "a blind eye to the reality of undocumented workers all across this state." *Id.* ¶ 22. Instead, the appellate courts have held that the determining factor in deciding whether an undocumented worker is entitled to modifier benefits is "[w]hether an employer knew or should have known, before the worker was injured, that a worker was undocumented." *Id.* ¶ 26.

{11}    The Court reasoned that such an approach is consistent with both the Act and IRCA, which discourages illegal immigration by making it unlawful for employers to hire undocumented workers. *Id.* ¶ 28. In accordance with IRCA, "employers have an affirmative duty to determine that their employees are authorized." *Id.* (internal quotation marks and citation omitted). This duty is fulfilled by an employer completing an I-9 form and examining specific documents that establish the worker's identity and eligibility to lawfully work in the United States. *See id.*

{12} Therefore, *Gonzalez* declares that "[t]he I-9 [f]orm is how an employer gains knowledge of a newly hired worker's eligibility for employment." *Id.* ¶ 29. "[A]n employer who does not properly fill out an I-9 [f]orm and demand necessary documentation, as is required, either should have known or is deemed to have known that the worker would likely be undocumented[.]" *Id.* If the employer had such knowledge based on the I-9 form, the worker would be "entitled to modifier benefits." *Id.* ¶ 35. In the event that an undocumented worker presents false documents, an employer who has complied in good faith with IRCA's requirements has an affirmative defense to a violation of federal law, and would not be responsible for paying the worker modifier benefits. *Id.* ¶ 30.

{13} The underlying policy purpose behind such an approach is this: "[I]f a worker presents false documents to an employer during the initial hiring and the employer does not otherwise know or should know of the worker's undocumented status, then the worker should not be allowed to benefit from such deception by collecting modifier benefits." *Id.* ¶ 30. In essence, this balancing of the worker's actions against the employer's actions serves to assure that neither party benefits from taking advantage of the other.

{14} In the event that both parties made mistakes throughout the hiring process, our inquiry then focuses on which party is more culpable. *See id.* ¶ 31 ("Whichever party

is more culpable, by either failing to perform an affirmative duty or presenting false documents to obtain employment, suffers the most; he is not permitted to benefit from that party's own wrongdoing.").

**C.      Standard of Review**

{15}    "We review workers' compensation orders using the whole record standard of review." *Leonard v. Payday Prof'l*, 2007-NMCA-128, ¶ 10, 142 N.M. 605, 168 P.3d 177. We give deference to the fact-finder where findings are supported by substantial evidence. *See DeWitt v. Rent-A-Ctr., Inc.*, 2009-NMSC-032, ¶ 12, 146 N.M. 453, 212 P.3d 341. "Substantial evidence on the record as a whole is evidence demonstrating the reasonableness of an agency's decision[.]" *Id.* We will not "reweigh the evidence [or] replace the fact[-]finder's conclusions with our own." *Id.*

{16}    Our analysis is also guided by *Gonzalez*. In light of *Gonzalez*, the narrow focus of our inquiry is therefore, whether the employer knew or should have known of the worker's undocumented status when the worker presented false identification documents to the employer during the hiring process. *See* 2013-NMSC-021, ¶ 30.

**D.      Employer Properly Confirmed Worker's Eligibility to Work**

{17}    Worker argues that the I-9 forms were substantively incomplete, because Worker did not attest to citizenry or legal employment, consequently Employer knew or should have known that Worker was undocumented. Worker further argues that

because Employer knew or should have known of Worker's undocumented status, it is not entitled to the good faith affirmative defense. Worker contests the WCJ's following findings of fact:

> 19. The Preparer and/or Translator Certification was not filled out on either of the I-9 [form]s nor [were they] necessary to be completed because Worker did not require assistance in completion of Section 1.
>
> . . . .
>
> 22. The [July] 2006 I-9 [form] contains no omissions
>
> . . . .
>
> 29. Employer followed appropriate procedures in hiring employees including Worker.

Worker contests the WCJ's following conclusion of law:

> 4. Under the totality of the evidence Employer reasonably relied upon Worker's representations and there was no reasonable basis for Employer to have known Worker was undocumented.

{18} Employer argues that any errors in completing the I-9 form were technical errors. Employer further contends Worker knowingly presented false documentation in order to obtain employment. The WCJ found that Employer reasonably relied on Worker's false documentation to support his employment paperwork, and there was no reasonable basis for Employer to have knowledge that Worker was undocumented.

{19} Rich Salls, Vice President for Salls Brothers Construction, Inc., testified at trial about the company's structure and general hiring process. He explained that every

prospective employee filled out an application at the company's main office and participated in an interview. He further testified that if the company discovered through the hiring process that a prospective employee was not legally authorized to work, Employer would not hire him.

{20}     The record contains Worker's two I-9 forms that were in his personnel file. The common issue in both the June 2006 and July 2007 I-9 form is Worker's failure to complete the attestation provision. Both I-9 forms were signed by Worker and Teri Evans Salls, as employer's representative. The July 2006 I-9 form contains Worker's attestation that he is a lawful permanent resident, but is lacking a lawful permanent resident number under Section 1. At that time, his verification documents included a Colorado driver's license and a social security card for Section 2. It is undisputed that Worker furnished a false Colorado identification card and a false Social Security card that Employer relied on in verifying his employment eligibility with respect to Section 2 of the July 2006 I-9 form.

{21}     The June 2007 I-9 form does not contain an attestation by Worker that he is a lawful permanent resident, or his alien card number in Section 1; however, Worker provided a resident alien card with a number for purposes of Section 2, his reported birth date, as well as a social security card with the same name and number submitted eleven months earlier. The resident alien card was presented to Employer's

representative by Worker as evidence of his eligibility to work in the United States. By providing his signature in Section 1, Worker was aware of the federal penalties for providing false documentation in connection with the completion of the I-9 forms. Worker also provided his resident alien card and social security card when he sought authorization for medical examination or treatment that was authorized by Norma Ramirez, Employer's representative. Thus, Worker's failure to complete the attestation provision did not give Employer a reason to question Worker's resident alien status.

{22}     As we noted previously, Worker challenges finding of fact number 22—"[t]he [July] 2006 I-9 [form] contains no omissions." We assume that Worker's argument is directed at his failure to include a resident alien number in Section 1. Worker does not direct us to any legal authority that the resident alien number is required. *See Curry v. Great Nw. Ins. Co.*, 2014-NMCA-031, ¶ 28, 320 P.3d 482 ("Where a party cites no authority to support an argument, we may assume no such authority exists."). Nor were we able to find such a requirement in IRCA. *See* § 1324a(b)(1)(B)(ii) ("Documents establishing both employment authorization and identity. . . . A document described in this subparagraph is an individual's resident alien card, alien registration card, or other document designated by the Attorney General[.]"); § 1324a(b)(2) ("Individual attestation of employment authorization[.] The individual

10

must attest, under penalty of perjury on the form designated . . . , that the individual is . . . an alien lawfully admitted for permanent residence, or an alien who is authorized under this chapter or by the Attorney General to be hired, recruited, or referred for such employment.").

{23}     Worker argues that because he was assisted in completing the July 2006 I-9 form, the "Preparer and/or Translator Certification" should have been filled out. While Worker contests finding of fact number 19—Worker did not need help in completing Section 1—he does not challenge finding of fact number 18, that the "[e]vidence supports that Worker completed Section 1, [I-9 form] at Employer's main office." This finding supports the WCJ's determination that Worker did not require assistance in completing Section 1, therefore the certification did not need to be completed on either I-9 form. *See Seipert v. Johnson*, 2003-NMCA-119, ¶ 26, 134 N.M. 394, 77 P.3d 298 ("An unchallenged finding of the [lower] court is binding on appeal."). Worker does not direct us to anywhere in the record that would explain the assistance he claims to have received in filling out the July 2006 I-9 form, and we decline to presume what any such assistance entailed. *See Chan v. Montoya*, 2011-NMCA-072, ¶ 9, 150 N.M. 44, 256 P.3d 987 ("It is not our practice to rely on assertions of counsel unaccompanied by support in the record. The mere assertions

and arguments of counsel are not evidence." (internal quotation marks and citation omitted)).

{24}     There was no testimony or evidence presented at trial that suggests Employer had knowledge of Worker's undocumented status when he was initially hired in 2006. Instead, there is evidence to support that Employer was deceived by Worker in the hiring process when Worker knowingly presented false identification documentation that Employer accepted in good faith and believed to be legitimate upon inspection. Although we acknowledge that Employer made mistakes in completing Worker's I-9 forms, we hold that Worker's actions in providing numerous forms of false identification makes him the more culpable party. Therefore, we hold that Worker is unable to benefit from such wrongdoing by receiving modifier benefits.

{25}     Worker encourages us to adopt the Ninth Circuit's reasoning in *Ketchikan Drywall Services, Inc. v. Immigration & Customs Enforcement*, 725 F.3d 1103 (9th Cir. 2013), as a basis for rejecting Employer's affirmative defense. Under Worker's proposal, an undocumented worker would be able to benefit from knowingly presenting false identification if the employer failed to strictly comply with IRCA. *Ketchikan* is distinguishable from this case.

{26}     As a result of an audit of its I-9 forms, the *Ketchikan* employer received a warning notice from the Immigration and Naturalization Service (INS). 725 F.3d at

1108. Eight years later, the Immigration and Customs Enforcement (ICE) served employer with a notice of inspection and an administrative subpoena requesting original I-9 forms and attached documentation presented for completion of the I-9 forms for a period of three years. *Id.* ICE served an amended "Notice of Intent to Fine (NIF)" charging employer with four counts: (1) for 43 employees' failure to provide an I-9 form at all; (2) for 65 employees, Section 1—the employee information and attestation—was incomplete; (3) for 110 employees, Section 2—the employer or authorized representative review and verification—was incomplete; and (4) for 53 employees there were omissions in both sections. *See id.* at 1108-09. One of employer's arguments was that any deficiencies in the forms were merely technical or procedural in spite of its good faith attempt to comply with its statutory obligations. *See id.* at 1111-12. The *Ketchikan* court relied on the "Virtue Memorandum," which was an INS interim guideline from its "Acting Exec[utive] Comm[issioner] of Programs [for] Section 274A(b)(6) of the Immigration and Nationality Act [a]dded by Section 411 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 [(IIRIRA)]." *Ketchikan*, 725 F.3d at 1112. "The IIRIRA amended several parts of the . . . [INA]." *Valdez-Sanchez v. Gonzales*, 485 F.3d 1084, 1087 (10th Cir. 2007). *Ketchikan* noted that the Virtue Memorandum provided a "detailed, concrete guidance for dealing with omissions that might appear

on an I-9 [f]orm, indicating that the agency did indeed consider the issue thoroughly." 725 F.3d at 1112. However, the court also noted that "the agency ha[d] not fully explained the rationale underlying its guidance," but that "it ha[d] drawn the distinction between substantive violations and technical or procedural violations in a common-sense manner." *Id.* (internal quotation marks omitted).

{27}  If we were to rely on *Ketchikan*, we would essentially be equating a state administrative workers' compensation proceeding with a federal administrative immigration proceeding involving the requisite federal enforcement agency, ICE, and all that goes with it. We decline to do so. In the federal proceeding, an employer would have the benefit of at least an audit that would give employer notice that there is a problem with the I-9 form. *See* § 1324a(b)(6)(A) (stating that the presumption is that an employer has in good faith complied with the requirements, notwithstanding a technical or procedural failure to meet a requirement, and, if there is a failure to comply, the employer is provided with an explanation and time to correct any failures). If we relied on *Ketchikan*, Employer would be denied that opportunity to correct any omissions in a workers' compensation proceeding involving an individual worker. Under the circumstances of this case, strict compliance with IRCA is not consistent with the required balancing of interests the Act requires, as articulated by our Supreme Court in *Gonzalez*, and we therefore reject such an approach in this case.

14

**CONCLUSION**

{28}     For the foregoing reasons, we affirm the WCJ's compensation order.

{29}     **IT IS SO ORDERED.**

 

                      _____

                      **M. MONICA ZAMORA, Judge**

**WE CONCUR:**

 

_____

**MICHAEL E. VIGIL, Judge**

 

_____

**J. MILES HANISEE, Judge**